UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF MASSACHUSETTS

_____
INES McGILLIVRAY,                           )
        **Plaintiff**            )
                                            )
        V.                      )   CIVIL ACTION NO.
                                            )        05-11826-MLW
CIGNA GROUP INSURANCE and                   )
LIFE INSURANCE COMPANY                      )
OF NORTH AMERICA,                           )
        **Defendants**          )
_____)

**PLAINTIFF INES McGILLIVRAY'S OBJECTIONS TO THE REPORT
AND RECOMMENDATION ON PLAINTIFF'S MOTION FOR
JUDGMENT ON THE RECORD AND DEFENDANT'S MOTION FOR
JUDGMENT ON THE RECORD FOR JUDICIAL REVIEW**

**STATEMENT OF FACTS**

The Plaintiff, Ines McGillivray, was married to Paul McGillivray. On January 15, 2004, Paul McGillivray lost his life as the result of a motor vehicle which occurred that day. A copy of the Motor Vehicle Crash Police Report is included within the record (Ex.7, p.55) According to the Certificate of Death, Paul McGillivray died as the result of "multiple injuries due to blunt trauma." The Certificate of Death lists the manner of death as accidental.(Ex.6, p.52) The Plaintiff filed a claim for her husband's death pursuant to a policy provided through her employer   Partner's Health Care Systems, Inc. where she was employed as a staff nurse.(Ex.2, p.24)

The policy upon which the Plaintiff pursues a claim for the death of her husband Paul McGillivray is identified as

Policy No. OK 826557 , Life Insurance Company of North America Group Accident Policy, issued and underwritten by the Defendant LINA to Partner's Health Care Systems, Inc. (Ex.1, p.1) The coverage under this policy for the death of a spouse is $100,000.00 (Ex.1, p.10; Ex.2, p.24)

## **OBJECTIONS**

Pursuant to Rule 72(b) of the Federal Rules of Civil Procedure and Rule 3(b) of the Rules for United States Magistrates in the United States District Court for the District of Massachusetts, Plaintiff objects to that portion of the August 23, 2007 Report and Recommendation ("Report and Recommendation") which recommends denial of Plaintiff's Motion.  Plaintiff's objections include the arguments that were raised in the memoranda which he submitted in connection with the Motions and which are incorporated herein by reference.

The Report and Recommendation rests it determination on several erroneous conclusions and factual findings, as well as unfair and uneven application of judicial recognition of fact.

The Report and Recommendation specifically finds that "it appears that the Company assumed that Mr. McGillivray's subjective intent was simply unknowable and applied "an objective analysis of the insured's expectations." (Report p.15) Not only is this finding without factual support,  but

it completely ignores the fact that numerous sources were available from which the company could have determined Mr. McGillivray's subjective intent. During the claim review process, the Plaintiff provided information to LINA regarding the fact that the decedent had, just prior to the accident, voluntarily placed himself with the Addiction Recovery Program at the Faulkner Hospital under the care of Dr.Garner(Ex.5, p.47; Ex.22, pp.107-124).  Dr. Garner met with the deceased in connection with the Addiction Recovery Program on the two days prior to the accident in question.(Id.)  The Plaintiff informed LINA that she felt this treatment and the related medications may have played a part in the accident (Ex.5, p.47; Ex.16,p.96) LINA never reviewed the records of this treatment or spoke with Dr. Garner (Ex.25, p.127 'list of information reviewed')

In this case, LINA made absolutely no attempt to take into account the insured's expectations, personal characteristics, or experiences. To the contrary, LINA specifically was aware of the fact that the decedent had a long history of alcoholism and driving under the influence of alcohol, including arrests, the most recent being just 13 hours prior to the fatal crash (Ex.15, p.92; Ex.16, p.96). LINA obtained no evidence that any of these incidents

resulted in injury of any type to the decedent despite his long history of alcoholism. Any reasonable factfinder without a conflict of interest would recognize that the insured had driven under the influence of alcohol hundreds or thousands of times without injurious or deadly consequence. To infer that the insured subjectively expected to die, or was aware of a heightened risk of such, is pure fiction, factually and legally. Under First Circuit law, subjective belief of the decedent **is the first step of analysis.** Nonetheless, this crucial step is overstepped by the company as well as the Report and Recommendation.

"If the fact-finder determines that the insured did not expect an injury similar in type or kind to that suffered, the fact-finder must then examine whether the suppositions which underlay that expectation were reasonable. <u>Wickman v.Northeastern Nat. Ins. Co</u>., 908 F.2d 1077, 1088 (1st Cir. 1990)

The determination of what suppositions are unreasonable **should be made from the perspective of the insured**, allowing the insured a great deal of latitude and taking into account the insured's personal characteristics and experiences. <u>Id</u> *citing* <u>Ward v. Penn Mutual Life Ins. Co</u>*.,* 352 S.W.2d 413, 423 (Mo.Ct.App. 1961) (finding accident where man fell off

top of moving car; he had performed the stunt previously, knew, and trusted the driver, was strong, and had a good grip); Oldring v. Metropolitan Life Ins. Co., 492 F. Supp. 994 (D.N.J. 1980) (finding an accident where owner experienced in use of gun, after having examined the gun and thinking it was empty, pointed and fired the gun at his head, killing himself); Knight v. Metropolitan Life Ins. Co.(finding accidental the death of professional diver after diving off the Coolidge Dam; he previously had completed the same dive without injury).

Moreover, the Report and Recommendation, while rejecting the Plaintiff's use of statistics cited by other Courts, itself rests on statistics not considered by the company, using the same to support the denial of the Plaintiff's Motion.(Report p.17) The Report and Recommendation itself relies upon unconsidered statistical analysis, yet rejects the same as presented by the Plaintiff.

The fact that statistics were not presented by the pro se Plaintiff[1] during the insurance company's "investigation" should not form the basis for a legal denial of the same. The question is not, or should not be, whether the pro se Plaintiff presented such statistics, but whether or not the

---

[1] Plaintiff did not obtain counsel until after the final rejection of her claim.

insurance company should either have been aware of them or sought them out. In fact, the Report and Recommendation recognizes this issue. (Report p.20, n.9)

Under the analysis of this Report and Recommendation, absurd results would follow if applied elsewhere. For example, if an insured died in an a commercial airplane crash, and benefits were denied, the reasoning applied herein would require the applicant to have cited airline death statistics to the company, prior to denial, in order to prevail in an Erisa claim in Federal Court.

Similarly, the reviewing Court would be without the ability to infer knowledge of such statistics as being possessed by the insurer. The risks of airline travel are well known to most people, and in fact there is a higher likelihood of death traveling in an airplane than not traveling at all.

These are not the type of arguments that should form the foundation of legal decision, precedent or principle.

The report and recommendation does not recognize the substantial evidence of a conflict of interest, and that the adverse determination was "improperly motivated" beyond the fact that the  plan administrator had a financial stake in the benefit decisions.

LINA determined that the decedent Paul McGillivray did not die from an accident. However, this determination was

made without any inquiry into the decedent's subjective state of mind. During the claim review process, the Plaintiff provided information to LINA regarding the fact that the decedent had, just prior to the accident, voluntarily placed himself with the Addiction Recovery Program at the Faulkner Hospital under the care of Dr.Garner(Ex.5, p.47; Ex.22, pp.107-124).  Dr. Garner met with the deceased in connection with the Addiction Recovery Program on the two days prior to the accident in question.(Id.)  The Plaintiff informed LINA that she felt this treatment and the related medications may have played a part in the accident (Ex.5, p.47; Ex.16,p.96) LINA never reviewed the records of this treatment or spoke with Dr. Garner (Ex.25, p.127 'list of information reviewed') Under First Circuit law, subjective belief of the decedent is the first step of analysis.

"If the fact-finder determines that the insured did not expect an injury similar in type or kind to that suffered, the fact-finder must then examine whether the suppositions which underlay that expectation were reasonable. <u>Wickman v.Northeastern Nat. Ins. Co</u>., 908 F.2d 1077, 1088 (1st Cir. 1990)

The report and Recommendation directly undermines this principle, leaving it wholly up to the insurer whether such inquiry need be made. Compare to <u>Ward v. Penn Mutual Life Ins. Co</u>., 352 S.W.2d 413, 423 (Mo.Ct.App. 1961) (finding accident where man fell off top of moving car; he had performed the stunt previously, knew, and trusted the driver, was strong, and had a good grip); <u>Oldring v. Metropolitan Life Ins. Co.,</u> 492 F. Supp. 994 (D.N.J. 1980) (finding an accident where owner experienced in use of gun,

after having examined the gun and thinking it was empty, pointed and fired the gun at his head, killing himself); <u>Knight v. Metropolitan Life Ins. Co.</u>(finding accidental the death of professional diver after diving off the Coolidge Dam; he previously had completed the same dive without injury).

    In this case, LINA made absolutely no attempt to take into account the insured's expectations, personal characteristics, or experiences. To the contrary, LINA specifically was aware of the fact that the decedent had a long history of alcoholism and driving under the influence of alcohol, including arrests, the most recent being just 13 hours prior to the fatal crash (Ex.15, p.92; Ex.16, p.96). LINA obtained no evidence that any of these incidents resulted in injury of any type to the decedent despite his long history of alcoholism.

    Requiring an analysis from the perspective of the reasonable person in the shoes of the insured fulfills the axiom that accident should be judged from the perspective of the insured. <u>Wickman v.Northeastern Nat. Ins. Co</u>., 908 F.2d 1077, 1088 (1st Cir. 1990)(citations omitted)

    Further evidence of the improper motivation of LINA in denying benefits is found in the misuse of, or ignorance of, statistics regarding deaths involving drunk driving. Courts following the *Wickman* analysis have gone into great detail in stating that, contrary to LINA's contention, it is highly unlikely, and therefore unexpected, that driving under the influence of alcohol will lead to death.

    One such analysis from the Sixth Circuit, applying Wickman, finds that [the plan administrator] acted arbitrarily and capriciously in denying Plaintiff's request

for benefits by determining that decedent's death was not accidental. <u>Lennon v. Metropolitan Life Insurance Co. Case No.</u> 05-73450 (E.D.Mich. 2006)[2] The relevant portions of the decision are set forth below.

> "Statistics actually show that a person "is far more likely to be arrested for driving while intoxicated than to die or be injured in an alcohol related automobile crash, and far more likely to arrive home than to be either arrested, injured, or killed. <u>West v. Aetna Life & Accident Ins. Co</u>., 171 F. Supp. 2d 856, 904 (N.D. Iowa 1985). In *West,* the district court cited statistics compiled by the Federal Bureau of Investigation, which demonstrate that in the year 1996, while there were 1,033,000 nationwide arrests for drunk driving, there were less than 18,000 (i.e. 17,218) alcohol related traffic fatalities. <u>West</u>,171 F. Supp. 2d at 903-04. In other words, the statistics show that a drunk driver is sixty times more likely to be arrested than to die as a result of a traffic accident. In fact, as the district court noted in *West,* "[w]hat `common knowledge' should actually tell a person driving while intoxicated is that he or she is . . . far more likely to arrive home than to be either arrested, injured, or killed." *Id.* at 904. According to the National Highway Traffic Safety Administration, 17,419 persons died as a result of alcohol-related traffic deaths in 2002. Although a

---

[2]No reporter citation available

high number, it is remarkably low when compared to the number of times a person impaired by alcohol got behind the wheel of a car during the same year. The website operated by Mothers Against Drunk Driving states there were more than 159 million alcohol-impaired trips taken during 2002. Based upon these numbers, one out of every 9,128 alcohol-impaired trips results in a crash that causes a fatality. The court is unaware of any mathematical formula to calculate whether a result is reasonably foreseeable, but assumes that if a result has a 1-in-9,128 chance of occurring, it is not reasonably foreseeable. Realizing that the number of alcohol-impaired trips taken is an estimate, assume that the number was overestimated by 100 million trips. Even then, only one out of every 3,387 alcohol-impaired trips results in a fatality, a percentage still lower than the chances of being struck by lightning sometime during a person's lifetime. Page 12 402 F. Supp. 2d at 712 (internal footnotes omitted). As a result, although driving while intoxicated may cause death or injury, this does not necessarily mean that death or injury is a highly likely consequence — or even a reasonably foreseeable result — of driving while intoxicated. While Plaintiff provides examples of case law presenting statistical evidence supporting the conclusion that death or injury is not a highly likely consequence of drunk driving, there is nothing in the Administrative Record, nor any evidence

presented by Met Life in this action, contradicting this conclusion. Citing *Jones v. Metropolitan Life Insurance Co.,* Met Life argues that the Sixth Circuit only requires that it be objectively foreseeable that driving while intoxicated *could* result in a serious or fatal injury for an insured's death to be deemed non-accidental. The *Jones* court, however, summarizing the *Wickman* test, only refers to objective foreseeability. Nowhere in its opinion does the *Jones* court specify whether the foreseeability question is whether death *could* or *would* result. 385 F.3d at 664-65. *Wickman,* however, clearly considers "whether a reasonable person . . . would have viewed the injury as *highly likely* to occur as a result of the insured's intentional conduct." 908 F.2d at 1088 (emphasis added). In other words, the relevant inquiry is not whether a reasonable person views death as a result of drunk driving as a possible consequence (i.e. *could* happen), but whether a reasonable person views death as a highly likely or inevitable consequence of drunk driving (i.e. *would* happen).

*See also* Metro. Life. Ins. Co. v. Potter, 992 F. Supp 717, 730 (D.N.J. 1998) (applying *Wickman* in holding that the court cannot find as a matter of law that death is highly likely to occur as a result of drunk driving). The Eighth Circuit Court of Appeals used similar reasoning in finding that an insurance company arbitrarily and capriciously denied benefits when it determined that the insured's drunk driving related death was excluded under a self-inflicted

injury exclusion. <u>King v. Hartford Life & Accident Ins. Co.</u>, 414 F.3d 994 (8th Cir. 2005) (en banc). The court reasoned that it would be unreasonable to interpret the exclusion for self-inflicted injuries to include those injuries "that were unintended by the participant, but which were contributed to by alcohol intoxication." *Id.* at 1004. As the court explained, "[o]ne rarely thinks of a drunk driver who arrives home safely as an `injured' party . . ." *Id.*

The statistics cited by the *Lennon* Court **<u>make it abundantly clear that LINA was not justified</u>** in its determination that death is the "clearly foreseeable" consequence of drunk driving. Having failed to compile or review statistics regarding the rate or incidents of drunk driving fatalities, LINA's decision is further shown to have been improperly motivated.

Due to the existence of LINA's financial interest in the decision to exclude benefits, in combination with the failure to inquire into the decedents state of mind or the applicable statistics, LINA has demonstrated that its decision was improperly motivated, and a conflict of interest exists.

The benefit provisions of an ERISA regulated group life insurance program must be interpreted under principles of federal substantive law. <u>Wickman v.Northeastern Nat. Ins. Co.</u>, 908 F.2d 1077, 1084 (1st Cir. 1990) *citing* <u>Pilot Life Ins.</u>, 481 U.S. at 56-57, 107 S.Ct. at 1557-58. <u>Burnham v. Guardian Life Ins. Co.</u>, 873 F.2d 486, 489 (1st Cir. 1989). The federal common law on the issue of insurance benefits "must embody common-sense canons of contract interpretation." <u>Id.</u>  "Applying the basic tenets of contract

interpretation, the first place to look for a definition is in the terms of the policy contract itself. <u>Wickman</u>, 908 F.2d at 1084. These terms must be given their plain meanings, meanings which comport with the interpretations given by the average person. <u>Id.</u> *citing* <u>Hoffman v. Life Insurance Co.</u>, 669 P.2d 410, 416 (Utah 1983); <u>Knight v. Metropolitan Life Ins. Co.</u>, 437 P.2d 416 (Ariz. 1968); 10 *Couch on Insurance 2d,* § 41:9, 13 (1982).

"Courts have also held, nearly unanimously, "that insurance contracts must be liberally construed in favor of a policyholder or beneficiary . . . and strictly construed against the insurer in order to afford the protection which the insured was endeavoring to secure when he applied for the insurance." <u>Wickman</u>, 908 F.2d at 1084 *citing* 13 Appleman, *Insurance Law and Practice* § 7401 at 197 (1976) Notably, LINA, the insurer and fiduciary, has not included in the policy an alcohol or intoxication exclusion. No difficulty in draftsmanship would have prevented the inclusion of such a common provision had such an exclusion been intended.

## CONCLUSION

The Report and Recommendation should be reversed, as LINA'S Denial of Benefits to the Plaintiff was improperly motivated, the result of a conflict of interest, and arbitrary and capricious.

The insurer, parroted by the Magistrate Judge, claims that the dangers of drinking and driving are well known. This reliance upon **un-cited statistical conclusions** is adopted as reasonable and adopted as judically noticed fact. Yet, as set forth in Plaintiff's memorandum, these

conclusions are wrong. Nonetheless, the Plaintiff has not been afforded the judicial notice granted to the Defendant.

Whether examined under the arbitrary and capricious standard, or given heightened scrutiny as a result of improper motivation and conflict of interest, the denial of benefits in this case is improper and unsupported by any evidence. The single fact upon which LINA based its denial is the blood alcohol content of the decedent. No inquiry was made as to the decedent's state of mind, his tolerance for alcohol, other medications, the decedent's prior drunk driving injuries, or the lack thereof. No statistical evidence regarding the likelihood of death occurring due to drunk driving was investigated, considered, or cited by LINA. Statistics reveal that, contrary to LINA's contention, death due to drunk driving is highly unlikely and unforeseeable, whether viewed objectively or subjectively.

        Plaintiff,

        By her attorney,

           /s/Paul R. Chomko
        Paul R. Chomko, Esq.
        BBO No. 637716
        ALFORD & BERTRAND, LLC
        60 Arsenal Street
        Post Office Box 322
        Watertown, MA  02471-0322
        (617) 926-8800
        attorneys@alfordandbertrand.com

CERTIFICATE OF SERVICE

      I, Paul Chomko, Esquire, certify that a copy of the foregoing has been served upon Defendant listed below by ECF,  this 3d day of September, 2007

David B. Crevier, Esq.
Katherine R. Parsons, Esq.
Crevier & Ryan, LLP
1500 Main Street, Suite 2020
Springfield, MA 01115-5727

                    ___/s/ Paul Chomko_____
                    PAUL CHOMKO, ESQUIRE