UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

INES McGILLIVRAY,                        )
                                         )
        Plaintiff,                       )
                                         )
        v.                               )    C.A. No. 05-11826-MLW
                                         )
LIFE INSURANCE COMPANY OF NORTH          )
AMERICA,                                 )
                                         )
        Defendant.                       )
                                         )


MEMORANDUM AND ORDER


WOLF, D.J.                                    September 29, 2007

        The court has received the attached August 23, 2007,

Magistrate Judge's Report and Recommendation on the cross-motions

for judgement on the record filed by plaintiff Ines McGillivray and

defendant Life Insurance Company of North America.  The matters as

to which the plaintiff objected have been reviewed de novo.  See 28

U.S.C. §636(b)(1)(B) & (C); Delgado v. Bowen, 782 F.2d 79, 82 (7th

Cir. 1986).  Each of the plaintiff's objections were previously

raised in her initial briefing, and the Magistrate Judge addressed

each of her contentions.  The court finds the Magistrate Judge's

Report and Recommendation to be thorough, thoughtful, and

persuasive.

        Accordingly, it is hereby ORDERED that:

        1. The attached Report and Recommendation (Docket No. 26) is

ADOPTED and INCORPORATED pursuant to 28 U.S.C. §626(b)(1)(C).

    2. The plaintiff's Motion for Judgment on the Record (Docket No. 17) is DENIED.

    3. The defendant's Motion for Judgment on the Record (Docket No. 19) is ALLOWED.


                                          /s/ Mark L. Wolf
_____  _____
                                      UNITED STATES DISTRICT JUDGE

# United States District Court
# District of Massachusetts

INES McGILLIVRAY,
      Plaintiff,

    v.                   CIVIL ACTION NO. 05-11826-MLW

LIFE INSURANCE COMPANY
    OF NORTH AMERICA,
        Defendant.

## *REPORT AND RECOMMENDATION ON PLAINTIFF'S MOTION FOR JUDGMENT ON THE RECORD (#17) AND DEFENDANT'S MOTION FOR JUDGMENT ON THE RECORD FOR JUDICIAL REVIEW (#19)*

COLLINGS, U.S.M.J.

### *I. INTRODUCTION*

On September 7, 2005, after exhausting her administrative remedies, plaintiff Ines McGillivray (hereinafter "McGillivray") filed a complaint pursuant to the Employee Retirement Income and Security Act (hereinafter "ERISA"), 29

U.S.C. §§1001 *et seq.*, seeking to recover accidental death and dismemberment benefits under a Group Accident Policy issued by defendant Life Insurance Company of North America (hereinafter "the Company"). Specifically, McGillivray seeks a judgment declaring that the death of her husband is covered, and not excluded, under the terms of the applicable policy. On January 13, 2006, the Company filed its answer to the complaint, contending that McGillivray is owed no benefits or payments under the terms and conditions of the policy.[1]

On September 28, 2006, the parties filed an Agreed Upon And Complete Record For Judicial Review. (#14)  Approximately three months later, on or about December 15, 2006, McGillivray filed Plaintiff's Motion For Judgment On The Record and Brief In Support Of Plaintiff's Motion For Judgment On The Record. (#17)  Thereafter, on or about January 31, 2007, the Company filed Defendant's Motion For Judgment On The Record For Judicial Review (#19) together with a memorandum both in support of its motion and in opposition to the plaintiff's motion. (#20)  The Company also submitted a Statement Of

---

[1]

On June 7, 2006, Chief Judge Wolf entered an order referring the case to the undersigned for full pretrial case management, including all dispositive motions. (#10)  The cross-motions for judgment on the record were also each individually referred for the issuance of a report and recommendation as to disposition. (##18, 22)

2

Undisputed Material Facts In Support Of Its Motion For Judgment On The Record For Judicial Review. (#21)

At this juncture the record is complete and the cross-motions for judgment are poised for resolution.

## II. THE FACTS

On January 15, 2004, Paul McGillivray died as a result of a head-on automobile accident when his car crossed the center line of Lake Street in Peabody, Massachusetts and collided with a box truck. (Agreed Upon And Complete Record For Judicial Review #14 at 61) Mr. McGillivray was thrown from his car and later pronounced dead at Lynn Union Hospital from "multiple injuries due to blunt trauma." (#14 at 52) Approximately thirteen hours before the crash, Mr. McGillivray had been arrested for drunk driving and had his license revoked. (#14 at 67) The results of a post-accident toxicology report reflect that the decedent's blood alcohol level was 0.242, that being well above the legal limit for the Commonwealth of Massachusetts. He also tested positive for the presence of benzodiazepine. (#14 at 89)

The plaintiff, Paul McGillivray's wife, through her employer, was entitled to coverage under Group Accident Policy No. OK 826557 (hereinafter "the

Policy") which was underwritten by the Company.  (#14 at 1-23)  The Policy

included coverage for the accidental death of an insured, or the spouse of an

insured, in the amount of $100,000.  (#14 at 10)  On or about February 7,

2004, McGillivray completed a claim form for group term accidental death

benefits which was then certified and filed by her employer on her behalf on or

about February 26, 2004. (#14 at 24-25)  About three months later on May 12,

2004, the Company issued a denial of the plaintiff's claim for accidental death

benefits with regard to her husband's death. (#14 at 91)  The denial was

justified by the Company on the grounds that "Mr. McGillivray died as a result

of his own voluntary actions, namely driving a motor vehicle while intoxicated"

and, consequently, "that his death was not accidental but the foreseeable

consequence of his actions." (#14 at 93)

Within two weeks of the time that the denial of benefits issued, the

plaintiff appealed the Company's decision. (#14 at 95-101) After reviewing the

additional information provided by McGillivray, on November 17, 2004, the

defendant denied the plaintiff's appeal, reiterating that "Mr. McGillivray's death

was not accidental in nature, as his death resulted from drinking and driving,

which was the foreseeable result of his self inflicted, voluntary actions."  (#14

at 126-128)  The plaintiff then filed the instant ERISA action on September 7,

4

2005 seeking to recover accidental death benefits under the Policy.

### III. STANDARD OF REVIEW TO BE APPLIED IN THIS CASE

In a typical

> ERISA benefit denial case, trial is usually not an option:
> in a very real sense, the district court sits more as an
> appellate tribunal than as a trial court. It does not take
> evidence, but, rather, evaluates the reasonableness of
> an administrative determination in light of the record
> compiled before the plan fiduciary.

*Leahy v. Raytheon Co.*, 315 F.3d 11, 17-18 (1 Cir., 2002)(citations omitted). In

*Firestone Tire and Rubber Co. v. Bruch*, 489 U.S. 101 (1989), the Supreme Court

stated that when a denial of benefits is challenged under ERISA, 29 U.S.C.

§1132(a)(1)(B), the standard of review depends largely upon whether "the

benefit plan expressly gives the administrator or fiduciary discretionary

authority to determine eligibility for benefits or to construe the plan's terms."

*Id.* at 115. If the plan does give such discretion to the administrator or

fiduciary, "*Firestone* and its progeny mandate a deferential 'arbitrary and

capricious' standard of judicial review." *Recupero v. New England Tel. & Tel. Co.*,

118 F.3d 820, 827 (1 Cir., 1997) (quoting *Firestone*, 489 U.S. at 115); *see also*

*Wright v. R.R. Donnelley & Sons Co. Group Benefits Plan*, 402 F.3d 67, 74 (1 Cir.,

2005) (where the plan confers such authority upon the fiduciary, the decision

is upheld "unless it is 'arbitrary, capricious, or an abuse of discretion'")(quoting *Doyle v. Paul Revere Life Ins. Co.*, 144 F.3d 181, 183 (1 Cir., 1998)).[2]  The First Circuit "has interpreted the *Firestone* rule 'to mean that a benefits plan must *clearly grant* discretionary authority to the administrator before decisions will be accorded the deferential, arbitrary and capricious, standard of review.'" *Guarino v. Metropolitan Life Ins. Co.*, 915 F. Supp. 435, 443 (D. Mass., 1995) (quoting *Rodriguez-Abreu v. Chase Manhattan Bank, N.A.*, 986 F.2d 580, 583 (1 Cir., 1993)).

Under the arbitrary and capricious standard, the decision of the plan administrator will be upheld even where contrary evidence might suggest a different result, so long as the decision "is plausible in light of the record as a whole, . . . or, put another way, whether the decision is supported by substantial evidence in the record." *Leahy*, 315 F.3d at 17 (citing *Doyle*, 144 F.3d at 184). "Substantial evidence . . . means evidence reasonably sufficient to support a conclusion.  Sufficiency, of course, does not disappear merely by reason of contradictory evidence." *Doyle*, 144 F.3d at 184 (citations omitted); *see also*

---

[2]

"Arbitrary and capricious standard of review" language has been used interchangeably with the "abuse of discretion standard" in a number of cases.  *See Firestone*, 489 U.S. at 109-11; *Leahy*, 315 F.3d at 15 n.3; *Terry v. Bayer Corp.*, 145 F.3d 28, 37 n. 6 (1 Cir., 1998).

*Vlass v. Raytheon Employees Disability Trust*, 244 F.3d 27, 30 (1 Cir., 2001) ("[T]he existence of contradictory evidence does not, in itself, make the administrator's decision arbitrary."). A court must not substitute its judgment for that of the fiduciary or administrator if the fiduciary's or administrator's interpretation of the plan was "reasonable." *Terry v. Bayer Corp.*, 145 F.3d 28, 40 (1 Cir., 1998) (citing *DeWitt v. Penn-Del Directory Corp.*, 106 F.3d 514, 520 (3 Cir., 1997)).

When considering what standard of review is appropriate, it is first necessary to determine whether the provisions of the employee benefit plan under which recovery is sought reflect a clear grant of discretionary authority to decide eligibility for benefits. *Id.* at 37 (citations omitted). In the case at hand, the Policy provides that:

> For plans subject to the Employee Retirement Income Security Act (ERISA), the Plan Administrator of the Employer's employee welfare benefit plan (the Plan) has appointed the Insurance Company [the Company] as the Plan fiduciary under federal law for the review of claims for benefits provided by this Policy and for deciding appeals of denied claims. *In this role the Insurance Company shall have the authority, in its discretion, to interpret the terms of the Plan documents, to decide questions of eligibility for coverage or benefits under the Plan, and to make any related findings of fact. All decisions made by the Insurance Company in this*

> capacity shall be final and binding on Participants and
> Beneficiaries of The Plan to the full extent permitted by
> law.

Agreed Upon And Complete Record For Judicial Review #14 at 4 (emphasis added).

The language of this provision plainly states that the Company is the plan fiduciary, and the discretionary grant could hardly be clearer.

The plaintiff argues that because the discretion in determining eligibility for benefits is placed with the Company, the company also responsible for paying the benefits, the possibility of a conflict of interest arises such that the arbitrary and capricious standard of review should be adjusted so as to take this consideration into account. (#17, Exh. 1 at 3-4)  The Court in *Firestone* stated that "if a benefit plan gives discretion to an administrator or fiduciary who is operating under a conflict of interest, that conflict must be weighed as a 'facto[r] in determining whether there is an abuse of discretion.'" *Firestone*, 489 U.S. at 115 (quoting *Restatement (Second) of Trusts* § 187, Comment *d* (1959)). The First Circuit determined that "if a court concludes there is an improper motivation amounting to a conflict of interest, the court 'may cede a diminished degree of deference – or no deference at all – to the administrator's determinations.'" *Wright*, 402 F.3d at 74 (quoting *Leahy*, 315 F.3d at 16).

8

The First Circuit has recognized that to some extent a conflict would exist for an insurer "when a finding of eligibility means that the insurer will have to pay benefits out of its own pocket," *Pari-Fasano v. ITT Hartford Life and Accident Ins. Co.*, 230 F.3d 415, 418 (1 Cir., 2000) (citing *Doyle*, 144 F.3d at 184), but has noted that a countervailing motivation for the insurer simultaneously exists in that "having a benefit plan is to please employees, not to result in the employer's bad reputation." *Doyle*, 144 F.3d at 184. In other words, an employer could well decide to oust "an overly tight-fisted insurer." *Id.* While other courts differ in their approaches, the First Circuit has stated that it would adhere "to the arbitrary and capricious principle, with special emphasis on reasonableness, but with the burden on the claimant to show that the [insurer's] decision was improperly motivated." *Id.* This is described as arbitrary and capricious review with "more bite." *Id.*

The First Circuit subsequently clarified the "more bite" language in terms of reasonableness, explaining that "[t]he essential requirement of reasonableness has substantial bite itself." *Doe v. Travelers Ins. Co.*, 167 F.3d 53, 57 (1 Cir., 1999). Later decisions have more precisely defined this position, stating that in order to find that an insurer had abused its discretion under the

contract, the Court would have to conclude that the insurer's eligibility determination "was unreasonable in light of the information available to it." *Pari-Fasano*, 230 F.3d at 419.   To frame the issue another way, "an unreasonable determination would necessarily constitute an abuse of discretion, and a reasonable determination necessarily would not." *Id.*

Adherence to the traditional arbitrary and capricious review has been deemed to be appropriate where there were only "structural" conflicts because of the aforementioned market incentives to the insurer, namely the benefit in being viewed by the public as a company that provides for its insured.  *Denmark v. Liberty Life Assurance Co. of Boston*, 481 F.3d 16, 29-30 (1 Cir., 2007).  Last year the First Circuit underscored the fact that "'[t]o affect the standard of review...a conflict of interest must be real.   A chimerical, imagined, or conjectural conflict will not strip the fiduciary's determination of the deference that otherwise would be due.'"  *Tsoulas v. Liberty Life Assurance Co. of Boston*, 454 F.3d 69, 77 (1 Cir., 2006) (quoting *Leahy,* 315 F.3d at 16).

In her brief, the plaintiff argues that in addition to the fact that the Company would be paying the accidental death benefits out of its own pocket, there is additional evidence that a conflict of interest exists.   Specifically,

McGillivray points to the fact that in its determination, the Company did not undertake the proper analysis to determine what constitutes an "accident" as laid out by the First Circuit in *Wickman v. Northwestern National Ins. Co.*, 908 F.2d 1077 (1 Cir.), *cert denied,* 498 U.S. 1013 (1990). (#17, Exh. 1 at 7)  The plaintiff has cited no case law that requires a fiduciary such as the Company to apply the *Wickman* analysis when reviewing a claim for benefits or that holds that a failure to do so constitutes a conflict of interest warranting the application of a less deferential standard.[3]  The *Wickman* case will be discussed in detail, *infra.*  However, the Court rules that it is proper to apply the arbitrary and capricious standard of review in this case.

## IV. THE MERITS

As stated, *supra,* there is no doubt that Paul McGillivray, at the time of his death, was covered under the Policy which his wife obtained through her employment. The Policy in the instant case provides as follows:

We agree to pay benefits for loss from bodily injuries:

---

[3]

In the case of *King v. Hartford Life and Accident Ins. Co.,* 414 F.3d 994 (8 Cir., 2005), the Court remanded the matter to the administrator to apply the so-called *Wickman* test because the defendant had argued to the lower court that *Wickman* stated the correct test which was a change from the position which had been taken at the administrative level where a "reasonably forseeable" test was applied. *Id.* at 1003-1005.  The Court explicitly declined to decide which test was the appropriate one to apply in a case in which there had been no change in position from the administrative process to court litigation by the defendant. *Id.* at 1001-1002.

11

> a) caused by an accident which happens while an insured is covered by this policy.
>
> * * * *
>
> If, within one year from the date of accident covered by the policy, bodily injury results in: (1) the death of the Insured...we will pay the benefits provided for such loss....

Agreed Upon And Complete Record For Judicial Review #14 at 1, 13.

The Company interpreted these terms of the Policy in the following manner:

> This policy pays benefits only for loss which is the result of an accident.  The perils of drinking and driving have been widely publicized and are well known.  It is clearly foreseeable that drinking and driving can cause death or bodily harm, to a much greater degree than the act of driving while not intoxicated.  This policy specifically excludes benefit payment for loss which is the result of an insured's selfinflicted injuries.  It pays benefits only for loss which is the result of an accident, which is defined as a sudden unforeseen external event.[4] Mr. McGillvray's [sic] death was not accidental in nature, as his death resulted from drinking and driving, which was the foreseeable result of his self inflicted, voluntary actions,

---

[4]

    The Policy itself only states that it will cover bodily injuries "caused by an accident which happens while an insured is covered by this policy" (#14 at 1); it does not define the term "accident." In deciding plaintiff's claim, the Company defines the term "accident" as "a sudden unforeseen external event." (#14 at 127).  The plaintiff does not appear to dispute that the Company could have reasonably employed this definition.

and thus, no benefits are payable under policy OK
826557.

Agreed Upon And Complete Record For Judicial Review #14 at 127.

In determining whether the Company's decision was arbitrary and
capricious, the Court must consider the seminal First Circuit opinion in the
*Wickman* case.  In *Wickman,* the Court was faced with a claim for accidental
death benefits arising out of the insured's death which occurred after he
climbed over the railing on a bridge and fell off. *Wickman*, 908 F.2d at 1079.
The trial court found that the decedent "'knew or should have known that
serious bodily injury or death was a probable consequence substantially likely
to occur as a result of his volitional act of placing himself outside of the
guardrail and hanging on with one hand.'"*Id.* at 1089 (quoting *Wickman v.
Northwestern National Life Ins. Co.*, 1989 WL 129240, at *6 (D. Mass., 1989)).
In the process of reviewing and upholding the trial court's decision, the First
Circuit crafted a subjective/objective test to be used in determining what
constitutes "accidental" death.  *Id.* at 1087-89.

Under the *Wickman* test the fact-finder must first consider "the reasonable
expectations of the insured when the policy was purchased."  *Wickman*, 908
F.2d. at 1088.  Second, "[i]f the fact-finder determines that the insured did not

13

expect an injury similar in type or kind to that suffered," it is incumbent upon the fact-finder then to probe whether the insured's expectations were reasonable. *Id.*  After undertaking this analysis, "[i]f the fact-finder determines that the [insured's] suppositions were unreasonable, then the injuries shall be deemed not accidental." *Id.*

Lastly, if it is determined that the insured's subjective expectation is simply unknowable based on the available evidence, the fact-finder must turn to "an objective analysis of the insured's expectations." *Id.*  The fact-finder "must ask whether a reasonable person, with background and characteristics similar to the insured, would have viewed the injury as highly likely to occur as a result of the insured's intentional conduct." *Id.*   This final inquiry "from the perspective of the reasonable person in the shoes of the insured fulfills the axiom that [an] accident should be judged from the perspective of the insured." *Id.* (citation omitted).

As stated above, the trial court found that Wickman "'knew or should have known that serious bodily injury or death was a probable consequence substantially likely to occur as a result of his volitional act . . . .'"  *Wickman*, 908 F.2d. at 1089 (citation omitted).  On appeal, the First Circuit viewed this

14

finding as the equivalent of "a determination either that Wickman expected the result, or that a reasonable person in his shoes would have expected the result, and that any other expectation would be unreasonable." *Id.*

In the instant case, the initial claim was denied by the Company because it was "clearly foreseeable that driving while intoxicated may result in death or bodily harm." (#14 at 93)  In its review of the plaintiff's appeal, the Company further stated that "[t]he perils of drinking and driving have been widely publicized and are well known.  It is clearly foreseeable that drinking and driving can cause death or bodily harm, to a much greater degree than the act of driving while not intoxicated." (#14 at 126)

Thus, it appears that the Company assumed that Mr. McGillivray's subjective intent was simply unknowable and applied  "an objective analysis of the insured's expectations." *Wickman*, 908 F.2d. at 1088.  And, in the words of the *Wickman* opinion, the Company appears to have determined that  "...a reasonable person, with background and characteristics similar to [Mr. McGillivray], would have viewed the injury as highly likely to occur as a result of [his] intentional conduct." *Wickman*, 908 F.2d at 1088.

At the outset, there are difficulties in applying the *Wickman* standard to

the situation in which the insured is impaired.  In *Wickman,* there was no evidence that the decedent was impaired.  Thus, one could readily find "...a reasonable person, with background and characteristics similar to [Wickman], would have viewed the injury as highly likely to occur as a result of [his] intentional conduct." *Id.*   The question then becomes how Mr. McGillivray's "impairment"[5] is factored into the *Wickman* test?  Is the fact that he is impaired by reason of alcohol consumption a "characteristic" which must be considered?  Are we talking about a "reasonable person" who is impaired by reason of ingestion of excessive alcohol?[6]

Nonetheless, most courts employ the *Wickman* test in determining whether an insured's death or injury while operating a motor vehicle under the influence of alcohol is caused by an "accident", *Eckelberry v. Reliastar Life Ins. Co.,* 469 F.3d 340, 344  (4 Cir., 2006), *cert. denied,* ___ U.S. ___, 127 S.Ct. 2101

---

[5]

It cannot be contested that someone with the degree of blood alcohol of Mr. McGillivray was "impaired" because of alcohol consumption at the time of his death.

[6]

Some decisions have applied the *Wickman* test and found that death in certain circumstances was an "accident" entitling the payment of accidental benefits.  An example is *Todd v. AIG Life Ins. Co.,* 47 F.3d 1448 (5 Cir., 1995), in which the Court ruled that one who died while engaging in autoerotic asphyxiation during masturbation in an attempt to heighten sexual pleasure died "accidentally" because the insured did not expect to die (he intended to release the tightness of the collar around his neck before death could occur but passed out before he could loosen it) and "that such expectation was objectively reasonable, which it is if death is not substantially certain to result from the insured's conduct." *Todd,* 47 F.3d at 1456.  However, there was no issue in the case as to whether the decedent's expectation was clouded due to ingestion of unsafe amounts of alcohol or controlled substances.

(2007), and the majority have concluded that those who are injured or killed as a result of operating a motor vehicle under the influence of a substantial amount of alcohol are not injured or killed by reason of an "accident." *See Stamp v. Metropolitan Life Ins. Co.,* 466 F. Supp.2d 422, 432 (D.R.I., 2006)(collecting cases), *appeal pending,* No. 07-1061 (1 Cir.). The cases include two decisions by Circuit Courts of Appeals, i.e., *Eckelberry,* 469 F.3d 340, and *Cozzie v. Metropolitan Life Ins. Co.,* 140 F.3d 1104 (7 Cir., 1998).

In the *Eckelberry* case, the Court wrote:

> Plaintiff first argues that [the company's] interpretation of "accident" was unreasonable because drunk-driving injuries are not "highly likely" to occur... Whether the test is one of high likelihood, or reasonable forseeability, federal courts have found with near universal accord that alcohol-related injuries and deaths are not "accidental" under insurance contracts governed by ERISA.

*Eckelberry,* 469 F.3d at 344 (citations and footnotes omitted). The Court went on to find support in the record for the company's "determination that Eckelberry's death was not unexpected because he put himself in a position in which he should have known serious injury or death could occur." *Eckelberry,* 469 F.3d at 345 (internal quotations omitted).

In the *Cozzie* case, the company "...interpreted the term 'accident' to be

17

an event that is not 'reasonably forseeable'," *Cozzie,* 140 F.3d at 1109, and then

the Court seemed to equate this interpretation to the *Wickman* formulation that

"[i]f the expectations of the insured were objectively unreasonable, then injuries

or death resulting therefrom are not accidental." *Id.* at 1110 (citing *Wickman,*

908 F.2d at 1088).

The Eighth Circuit has appeared to hold that there is a difference

between a "reasonably forseeable" standard and the *Wickman* test of "highly

likely to occur."  This can be inferred from the fact that it remanded a case to

an administrator who had initially denied the claim because death was

"reasonably forseeable" and then defended the decision in the district court on

the ground that the result was "highly likely to occur." *King v. Hartford Life and

Accident Co.,* 414 F.3d 994, 1003-1005 (8 Cir., 2005) (*en banc*).[7]

There are two fairly recent cases which opine that most courts which

sustain findings that an injury or death occurring to a person driving while

under the influence is not an  "accident" misapply the holding of the *Wickman*

---

[7]

    It is of interest that the dissenting judges assert that the majority misconstrues the phrase "highly likely to occur" as used in the *Wickman* opinion. *King,* 414 F.3d at 1010-1012 (Gruender, J., dissenting).

case.[8]  These are *Lennon v. Metropolitan Life Ins. Co.,* 446 F. Supp.2d 745 (E.D.

Mich., 2006), *appeal pending,* No. 06-2234 (6 Cir.), and *West v. Aetna Life Ins.*

*Co.,* 171 F. Supp.2d 856 (N.D. Iowa, 2001).  To the same effect is the holding

of the district court in the *Eckelberry* case, 402 F. Supp.2d 704, 710 (S.D.W.Va.,

2005), which was reversed by the Fourth Circuit on appeal, 469 F.3d 340.

Both cases rely on statistics which indicate that a person who is driving

a vehicle with a blood alcohol above the legal limit "...is far more likely to be

arrested for driving while intoxicated than to die or be injured in an alcohol-

related automobile crash, and far more likely to arrive home than to be either

arrested, injured, or killed." *West,* 171 F. Supp.2d at 904; *Lennon,* 446 F.

Supp.2d at 751 (citing *West* and the district court opinion in *Eckelberry,* 402 F.

Supp.2d at 712.)  Indeed, in the instant case, plaintiff argues that there is

---

[8]

    A third case, *Harrell v. Metropolitan Life Ins. Co.,* 401 F. Supp.2d 802 (E.D. Mich., 2005), overturned a denial of benefits for a person who was killed while driving under the influence of alcohol.  However, in that case, the insurance company had denied the claim based on a conclusion that injuries sustained while driving after ingesting sufficient alcohol to be over the legal limit "constitutes intentionally self-inflicted injuries under the...Plan." *Harrell,* 401 F. Supp.2d at 807.  The Court refused to consider the argument that the death was not caused by an "accident" because the insurance company had not denied the claim on that ground.  *Id.* at 808-809, 811.  In another case, a district judge denied cross-motions for summary judgment in a case in which benefits were sought for an insured who was killed while driving with a blood alcohol level above the legal limit. *Metropolitan Life Ins. Co. v. Potter,* 992 F. Supp. 717 (D.N.J., 1998).  The Court found "...insufficient evidence to make a determination under either prong of the *Wickman* analysis" but chastised the insurance company for "...cit[ing] *Wickman* and then misappl[ing] it by ignoring its requirement that death be 'highly likely' to negate a finding of accidental death." *Id.* at 729-30.  The Court did not note on what basis it would decide the case having found insufficient evidence in the record and disputed issues of fact on the question of whether the death was an accident.

further evidence of the improper motivation of the Company in denying benefits in the "misuse of, or ignorance of" statistics relating to drunk driving deaths. (#17 at 7)

An initial problem is the manner in which this statistical evidence came before the Court.  In the instant case, it was never presented to the Company while it was considering plaintiff's claim and, thus, is not part of the administrative record.  Similarly, the statistics were not in the administrative record in the *West* case; rather, the Court, without objection from the defendant, took judicial notice of them. *West,* 171 F. Supp.2d at 903-904.[9]  No request for judicial notice has been made in the instant case.  In *Lennon,* the Court also seems to have taken judicial notice of the statistics without explicitly saying so.  It is unclear whether they were presented to the company before the claim was denied, but they may have been presented in the form of citations to cases in which the statistics were considered.[10] *Lennon,* 446 F. Supp.2d at 751-

---

[9]

The Court in *West* did drop a footnote, stating that "[t]he court also believes that such statistics or similar ones would be well-known to the insurance industry, which has an obvious interest in such information.  Thus, the court finds that [the defendant] either knew or should have known of this evidence at the time it denied Mrs. West's claim for accidental death benefits." *West,* 171 F. Supp.2d at 904, n. 8.  In the instant case, the Court has not been asked to make such a finding.

[10]

This is suggested by the Court's statement that "[w]hile Plaintiff provides examples of case law presenting statistical evidence supporting the conclusion that death or injury is not a highly likely consequence of drunk driving, there is nothing in the Administrative Record nor any evidence presented by

752. In the district court opinion in the *Eckelberry* case, it appears that the statistics were not part of the administrative record or presented by either party but rather discovered and relied upon by the Court. *Eckelberry,* 402 F. Supp.2d at 712.[11]

In the instant case, McGillivray asserts that courts following the *Wickman* analysis have gone into great detail in stating that it is actually highly unlikely that driving under the influence of alcohol will lead to death. (#17 at 7) The plaintiff quotes extensively from the *Lennon* case and notes the similar use of statistics on the point in the *King* and *Potter* cases.

The fundamental problem with McGillivray's position is that she never proffered any statistical evidence to the defendant as part of her claim. Under First Circuit law, review of the Company's decision is limited to the evidentiary record presented to the administrator. If information is not presented to a decision-maker for consideration, surely that decision-maker cannot be faulted

---

[the insurance company] in this action, contradicting this conclusion." *Lennon,* 446 F. Supp.2d at 751. (footnote omitted) What is unclear is whether the examples which Plaintiff "provides" were provided at the administrative level or for the first time after the case was filed in court. If the latter, it would seem that the Court expected that the insurance company would have cited the statistics *sua sponte.*

[11]

It is of note that in the *Stamp* case, the Court considered the statistical evidence which appears to have been presented for the first time after the case had been filed in court. *Stamp,* 446 F. Supp.2d at 431-32. Even though the court did not follow the cases which relied on the statistical evidence, there is no mention of the fact that the statistical evidence was not presented during the administrative process.

or found to have acted unreasonably for not factoring that information into the decision. *Liston v. Unum Corp. Officer Severance Plan*, 330 F.3d 19, 23 (1 Cir., 2003) (citing *Mills v. Apfel*, 244 F.3d 1, 4-5(1 Cir., 2001), *cert. denied*, 534 U.S. 1085 (2002)). As the First Circuit has noted, "[t]he decision to which judicial review is addressed is the final ERISA administrative decision. It would offend interests in finality and exhaustion of administrative procedures required by ERISA to shift the focus from that decision to a moving target by presenting extra-administrative record evidence going to the substance of the decision." *Orndorf v. Paul Revere Life Ins. Co.*, 404 F.3d 510, 519 (1 Cir.), *cert. denied*, 546 U.S. 937 (2005) (citing *Liston*, 330 F.3d at 24). The First Circuit did state in *Liston* that there may be situations where additional evidence is allowed, such as where "the decisional process is too informal to provide a record." *Liston*, 330 F.3d at 23. However, at a minimum "some very good reason is needed to overcome the strong presumption that the record on review is limited to the record before the administrator." *Id.* McGillivray offers no such reason for the allowance of the statistical evidence, other than the fact that the Company did not take them into account.

This precedent requiring that the case be decided solely on the basis of the

administrative record bars the Court in the instant case from considering this statistical evidence. This makes eminent sense. If a claimant is relying on statistical evidence, the administrative decision-maker should have those statistics presented as part of the administrative process so that, at the very least, the decision-maker can determine whether to accept or reject the statistics or produce further statistics on the point. The Court can then decide whether the decision-maker's use of the statistics was within its discretion, and if an error was made, whether that error renders the final decision arbitrary and capricious.

If it were found that the Court should consider the statistics notwithstanding the fact that they were not submitted during the administrative process, the statistics are not conclusive. As the Court in the *Stamp* case wrote, they "do not consider the characteristics of the driver, the type of road involved, the length of the fatal drive, how long the driver had been intoxicated, and most importantly, the degree of his intoxication." *Stamp*, 466 F. Supp.2d at 432.

This bring us back to a discussion of the *Wickman* holding, which is binding on district courts in this Circuit, and how to apply the holding in the instant case. First, the Court finds no evidence in the record from which it can

be determined whether Mr. McGillivray did or did not "...expect an injury similar in type or kind to that suffered..." *Wickman,* 908 F.2d at 1088.  Thus, as indicated, *supra, Wickman* teaches that "an objective analysis of the insured's expectations" must be undertaken. *Id.* (citation omitted). "In this analysis, one must ask whether a reasonable person, with background and characteristics similar to the insured, would have viewed the injury as highly likely to occur as a result of the insured's intentional conduct." *Id.*

In the instant case, Mr. McGillivray's "intentional conduct" occurred after he was released at 11:30 A.M. on January 15, 2004 following his court appearance.  This intentional conduct was taken presumably when his judgment was not significantly impaired (since he had been in police custody without alcohol from 1:15 A.M. to 11:30 A.M., a period of over ten hours).  Applying *Wickman,* the Court finds that it is at this point in time, i.e., after he left court at 11:30 A.M. on January 15, 2004 and intentionally decided to drink and drive, that the analysis must begin.  It makes no sense to try to judge the conduct as of the time seconds before the crash when he was plainly impaired by alcohol.

So the question then becomes whether a reasonable person, at that point

24

in time, with a background and characteristics similar to Mr. McGillivray, "would have viewed the injury as highly likely to occur" as a result of this intentional conduct. *Wickman,* 908 F.2d at 1088. The task then is to scour the record to determine what Mr. McGillivray's "background and characteristics" were at that point in time.

Mr. McGillivray was admitted to Faulkner Hospital on January 13, 2004 at about 4:00 P.M. for detox in an "intoxicated" condition. (#14 at 111) Upon admission, it was noted that he had been in Faulkner Hospital and McLean's "about 24 times" and "has had no significant abstinence in 25 years." (#14 at 111) At 10:30 P.M. the next day, January 14, 2004, he left Faulkner Hospital against medical advice. (#14 at 149, 159) At the time he left, he signed a statement to the effect that he was "aware" that he was in the hospital for "alcoholism," that he was "encouraged to stay and complete his detox," and that he was "at high risk for seizure or DT's" and was "a risk for relapse." (#14 at 159)

Less than three hours later, Mr. McGillivray was stopped at 1:15 P.M. on January 15, 2004 for driving the wrong way on Lowell Street in Peabody. (#14 at 67) He was arrested for operating a motor vehicle under the influence of

liquor, and his license was revoked. (#14 at 64)  He was held for a court

appearance after which he was released at 11:30 A.M. (#14 at 67)[12]  It was only

two and a half hours later at 1:51 P.M. that the fatal collision occurred.  (#14

at 63)  In that two and a half hours, Mr. McGillivray managed to consume

enough alcohol so that his blood alcohol level was three times the legal limit.

(#14 at 89)[13]

These being Mr. McGillivray's "background and characteristics" at the

time he left the court at 11:30 A.M., the question then becomes whether a

reasonable person with these "background and characteristics" "would have

viewed the injury as highly likely to occur as a result of [such] intentional

conduct?" *Wickman,* 908 F.2d at 1088.  The answer has to be in the affirmative.

A reasonable person (a) who checked out of detox against medical advice,[14] (b)

---

[12]

This information comes from a newspaper report which is in the record.  It does not appear that any police or court records from this incident were made part of the record, although the earlier arrest is referenced in the police report of the fatal accident. (#14 at 64)

[13]

It can be reasonably inferred that he had drunk two-thirds of a bottle of vodka in that two and a half hours since "...a new brown paper bag with a bottle of Smirnoff's Triple Distilled Vodka with a fresh price mark of $12.99 was found behind the driver's seat... [and] the bottle was only one-third full." (#14 at 64)

[14]

Here again the Court faces the difficulty in applying the *Wickman* test to one who suffers from an addiction. Clearly, a reasonable person would not check out of detox against medical advice. One might say that a reasonable alcoholic would not check out of detox against medical advice.  For purposes of this case, the Court judges Mr. McGillivray's actions as of the time after he left the court and began ingesting alcohol in substantial quantities over a short period of time.  In other words, the Court judges him by what a reasonable person would have done at that time despite the fact that he had done things which a reasonable

was told at the time of checkout that he was likely to relapse and was at risk

from seizures and DTs, (c) was stopped less than three hours later for driving

the wrong way down a street and arrested for operating a motor vehicle under

the influence of liquor, (d) had his license to drive revoked, (e) was held in

police custody for a period of about ten hours, (f) had a court appearance, and

then (g) commenced driving while ingesting substantial quantities of alcohol

over a two and a half hour period "would have viewed [an] injury as highly

likely to occur." *Id.*

And, in fact, the injury occurred as one might have expected it to in those

circumstances. Mr. Gary Reynolds, the driver of the vehicle who was behind Mr.

McGillivray's vehicle made observations which he related to the police as

follows:

> [H]e observed the Chev. Tahoe [Mr. McGillivray's
> vehicle] in front of him, after they both came off Route
> One and onto Lake St. His attention was brought to the
> Tahoe, because the vehicle swerved onto the left side
> of the roadway and went off of the road, and then
> pulled back to the right.  The Tahoe did this a couple
> of times, continuing to swerve.  It did not appear to be
> speeding.  The Tahoe did not return completely to the
> right of the centerline, as he had two tires always left
> of the centerline. Mr. Reynolds stated that the Tahoe

man would not have done, i.e., left detox against advice, earlier.

27

> suddenly accelerated, as if he just woke up. Mr. Reynolds was sounding his horn, attempting to get the attention of the driver. When this failed, he knew they were approaching the hill, and the Tahoe was still operating left of center. Mr. Reynolds continued to sound his horn, hoping to warn drivers from the opposite direction. He saw the Truck coming from the opposite direction and saw the truck try to steer to the right, to try to avoid a collision, but they hit head-on. The Tahoe bounced off the truck, swerved to the right and rolled over.

Agreed Upon and Complete Record for Judicial Review #14 at 63-4.

Manifestly, the Court can hardly find that the administrator was "arbitrary and capricious" when he decided on this record that the injury and death were not the result of an accident. A Court must not substitute its judgment for that of a fiduciary or administrator if the interpretation of the plan was "reasonable." *Terry*, 145 F.3d at 40 (citing *DeWitt*, 106 F.3d at 520).[15] Applying the *Wickman* test laid out above to the facts at hand, the Company's interpretation of "accident" was reasonable. The decision of the plan administrator is to be upheld even where contrary evidence might suggest a different result, so long as the decision "is plausible in light of the record as a

---

[15]

In all candor, the Court must note that even if it were to apply a *de novo* standard rather than an "arbitrary and capricious" standard, the Court, applying the *Wickman* test, would find that Mr. McGillivray's death was not the result of an "accident."

whole, . . . or, put another way, whether the decision is supported by substantial

evidence in the record." *Leahy*, 315 F.3d at 17.[16]

## V. CONCLUSION AND RECOMMENDATION

For the reasons stated, I RECOMMEND the Plaintiff's Motion For

Judgment On the Record (#17) be DENIED. I FURTHER RECOMMEND that

the Defendant's Motion For Judgment On The Record For Judicial Review

(#19) be ALLOWED and that judgment enter for the defendant.

## VI. REVIEW BY THE DISTRICT JUDGE

---

[16]

In response to the plaintiff's appeal of the Company's initial denial of her claim, in addition to stating that Mr. McGillivray's death was not an "accident" within the meaning of the Policy, the defendant asserted that Mr. McGillivray's death "was the foreseeable result of his self inflicted, voluntary actions." (#14 at 127) Under the "Exclusions" section, the Policy provides that "No benefits will be paid for loss resulting from . . . 1) intentionally self inflicted injuries, or any attempt thereat, while sane or insane." (#14 at 3) The Company now argues, in the alternative to the death not being an "accident," that it was a "self inflicted injury" within the exclusion of the Policy. The First Circuit has not ruled specifically on what constitutes a "self-inflicted injury" and courts are divided on whether driving drunk can bar recovery under an insurance policy when intoxication is not specifically excluded by the policy by invoking "self inflicted injury" exclusionary language. *See, e.g., King v. Hartford Life Ins. Co.,* 414 F. 3d 994, 1004 (8 Cir., 2005) (and cases cited). Having reached the conclusion that the Company's decision that Mr. McGillivray's death was not an "accident" within the meaning of the Policy must be upheld, there is no reason to reach this alternative argument.

The Company also advances the argument that the plaintiff is not entitled to benefits because the decedent died in the commission of a felony. Under Massachusetts law it is a felony to operate a motor vehicle recklessly or negligently with a blood alcohol content in excess of 0.08 and by such operation cause serious injury. *See* Mass. Gen. L. c. 90 §24L(1); Mass. Gen. L. c. 274 §1. The record evidence supports the conclusion that Mr. McGillivray violated those statutory provisions in that he had a blood alcohol level over three times the limit, he drove in a reckless or negligent manner by crossing the center line, and he caused the driver of the box truck serious injury. (#14 at 61-66) That having been said, the Court will not consider this rationale for upholding the Company's decision because the Company did not rely on this ground in denying the plaintiff's claim. *See, e.g., King*, 414 F.3d at 1004. ("Hartford argues alternatively that we should affirm on a ground not relied upon by the district court. ...We reject this alternative argument...because it represents another effort to uphold the administrator's decision with a *post hoc* rationale not expressed when benefits were denied.").

The parties are hereby advised that pursuant to Rule 72, Fed. R. Civ. P., any party who objects to this recommendation must file a specific written objection thereto with the Clerk of this Court within 10 days of the party's receipt of this Report and Recommendation.  The written objections must specifically identify the portion of the recommendation, or report to which objection is made and the basis for such objections.  The parties are further advised that the United States Court of Appeals for this Circuit has repeatedly indicated that failure to comply with Rule 72(b), Fed. R. Civ. P., shall preclude further appellate review.  *See Keating v. Secretary of Health and Human Services*, 848 F.2d 271 (1 Cir., 1988); *United States v. Emiliano Valencia-Copete*, 792 F.2d 4 (1 Cir., 1986); *Scott v. Schweiker*, 702 F.2d 13, 14 (1 Cir., 1983); *United States v. Vega*, 678 F.2d 376, 378-379 (1 Cir., 1982); *Park Motor Mart, Inc. v. Ford Motor Co.,* 616 F.2d 603 (1 Cir., 1980); *see also Thomas v. Arn*, 474 U.S. 140 (1985).

*/s/ Robert B. Collings*
ROBERT B. COLLINGS
United States Magistrate Judge

August 23, 2007.

30